RAY A. GILLILAN, d/b/a Fox Fields, *et al.*, Plaintiffs-Appellants, *v.* ILLINOIS RACING BOARD *et al.*, Defendants-Appellees.

Second District    No. 80-388

Opinion filed October 22, 1980.

William C. Murphy, of Reid, Ochsenschlager, Murphy & Hupff, of Aurora, for appellants.

William J. Scott, Attorney General, Daley, Reilly & Daley, Jeremiah Marsh, and Michael M. Conway and David O. Toolan, both of Hopkins, Sutter, Mulroy, Davis & Cromartie, all of Chicago (Moshe Jacobius, Assistant Attorney General, of counsel), for appellees.

Mr. JUSTICE UNVERZAGT delivered the opinion of the court:

This appeal arises from the denial of plaintiff's application for a license to conduct a racing meet at Fox Fields (formerly known as Aurora Downs) during 1980.

After being out of operation for some years, the race track formerly known as Aurora Downs was acquired by the plaintiff, Ray A. Gillilan, in 1978. In July 1979, he applied for a license to operate a harness racing meet during 75 days of the 1980 racing season, being 52 Sundays and 23 other weekend days. (Later, this was amended to Sunday dates only.)

The Illinois Horse Racing Act of 1975 (Ill. Rev. Stat. 1979, ch. 8, par. 37—1 et seq.) provides for the creation of a board of seven members to administer the Act, giving them the power to issue licenses for race meetings, which cannot be held without such a license. The board has the power to allot the dates on which or during which a race meet may be held to the various applicants and provides (under section 19(a)(1)) that no license may be granted "to any person at any place within 45 miles of any other place licensed by the Board to hold a race meeting on the same date during the same hours * * *." A further provision of section 19(a)(4) states that a license will not be granted "to any person who does not at the time of application for the organization license own or have a contract or lease for the possession of a finished race track suitable for the type of racing intended to be held by the applicant and for the accommodation of the public."

These provisions are pertinent because Fox Fields Racing Association, Inc. (which is the present name of the track formerly known as Aurora Downs) was within 45 miles of other licensed race tracks and in September of 1979, when Gillilan applied for a license, his track needed certain repairs and improvements before it could be used for racing.

Hearings were held by the board in September 1979, on the applications of various race track organizations which had applied for licenses to race. These were not the usual administrative hearings in that the participation of the applicant or his counsel was restricted to the answering of questions raised by the board. Of all the applicants only two—Fox Fields and Cahokia Downs—were rejected, and Cahokia Downs' rejection was based on admitted financial difficulties. As to Gillilan's application for racing dates for Fox Fields, this was rejected as part of a general order—not specifically—by simply failing to allot any dates to Fox Fields

for the year 1980, without specific mention of Fox Fields or Ray Gillilan. Prior to the formal order allotting racing dates for 1980, Gillilan appeared before the board on September 24, 1979, and was questioned as to his financial worth and background and the physical condition of the race track. At this session of the board questions were asked of him and to supplement his answers to such questions he was allowed to produce witnesses as to the physical condition of the race track and its prospects for the future. Questions as to his financial background were answered by Ray Gillilan personally. No decision as to his application was announced at that time.

On October 29, 1979, Gillilan, not having received any word from the board on his application, filed a second application in which he stated that certain improvements lacking at the time of the original application had been accomplished. This application was not considered by the board. On November 10, 1979, the board held an emergency meeting and rejected the second application on the ground of *"administrative res judicata"*—that is, that it was the same application that had been considered in September. On November 15, 1979, the board issued its general order including its finding on all the applications for racing dates which had been submitted by various organizations in Illinois. In this order the board made various findings of fact as to several racing organizations, including Fox Fields, indicating that as to that organization there were certain deficiencies in its track and public facilities and raising some questions as to Gillilan's financial integrity. The board's decision to disallow Gillilan's application, however, was not specific—the decision to do so was simply indicated by not allotting any racing dates to Fox Fields.

In January 1980, a third application for racing dates for Fox Fields was presented to the board, this time in the name of Fox Fields, a corporation. It asked only for 44 Sundays of racing. This application was also denied in an order in which the board repeated the objection raised as to the second application—that "although cloaked in the form of a corporation, it does not represent a new application for racing dates. Rather it is the same people, applying for the same racing dates, at the same racing facility as twice previously denied by the board." However, while this language would seem to indicate that *"administrative res judicata"* was again the basis for the denial, the actual ground of this order apparently is that the dates requested "have already been allotted." This conclusion was apparently based on the board's opinion that Sundays falling within the beginning and ending dates of a licensed race meeting are included within the time allotted to that race meeting, and therefore are no longer open.

Following the denial of the second application without a hearing, Gillilan filed a complaint for administrative review of the board's

decision. Certain competing race track organizations sought permission, which was granted, to intervene in the action. The third application for racing dates was denied while the administrative review action as to the second application was pending.

■■ After reviewing the record of the proceedings before the Illinois Racing Board and considering the briefs and arguments of both parties and the intervenors, the circuit court affirmed the denial of the plaintiff's three applications for racing dates. In this appeal from the circuit court's judgment upholding the board, the plaintiff contends:

(1) That the board's decision was against the manifest weight of the evidence;

(2) That the denial of the application filed October 29, 1979, and that filed January 30, 1980, was in violation of the Administrative Procedure Act and the Illinois Horse Racing Act, and

(3) That the Illinois Horse Racing Act itself is unconstitutional in failing to set reasonably definite standards for the exercise of the board's discretion.

We reject at the outset the contention that the Illinois Horse Racing Act is unconstitutional because in giving consideration to "financial integrity" as a standard for granting an application to race, it fails to define that term and leaves a finding as to financial integrity to the discretion of the board. In view of the ramifications and possible financial involvements of various kinds by a horse track organization, we think this general term is not inappropriate. The board found that Gillilan lacked sufficient capital "with which to organize, promote and operate a successful race meet at Aurora Downs." In view of the incumbrances on the property and the necessary prospective outlays to put it into good operating condition which were disclosed by Gillilan at the time of the application, we do not think it was against the manifest weight of the evidence for the board to find that Gillilan did not meet this criterion. In view of the involved nature of the racing industry and its relation to the public, the term "financial integrity" must be given a broad meaning and its use without further definition is not, in our opinion, an abuse of due process. In construing whether or not the phrase "financial integrity" is impermissibly vague it is not, of course, necessary for us to determine whether or not Gillilan in fact lacked financial integrity.

With regard to the contention that the board's action was against the manifest weight of the evidence, the plaintiff contends the decision was arbitrary and preconceived and that the reasons indicated by the board in its general order of November 15, 1979, for not granting racing dates to Gillilan were trivial and "totally unsupported in the record." We do not agree that the facts found by the board on the basis of the application and the board's investigation and questioning of witnesses, including Gillilan,

were trivial. The board found (a) that "the facilities and accommodations at Aurora Downs [Fox Fields] are inadequate for the conduct of a horse race meeting." This conclusion was based on specific deficiencies as to the barn area, the lack of adequate ditching to prevent flooding and the fact that the grandstands and barns are not in compliance with the Illinois Race Track rules for fire safety. It was conceded that repairs were necessary to the back stretch for racing purposes. Gillilan estimated he was at the time of the application 46% in compliance with sprinkler requirements under a schedule which called for 60% compliance at the time of the application. These are not trivial deficiencies and, in fact, Gillilan admitted that at the time of the hearing he did not have a finished race track that was suitable and ready for the public. Thus the board had substantial evidence before it that physically the race track was not in satisfactory condition at the time the application of September 1979 was filed. While Gillilan estimated he could put it in good and satisfactory condition for $350,000, his financial statement did not indicate he could spend that much money beforehand but must wait on track receipts after the track began to operate in order to complete the repairs. Moreover, one of the commissioners was of the opinion that the estimate of $350,000 to make satisfactory repairs was quite low and something around a million dollars would be needed. The finding with regard to the unsatisfactory physical condition of the track appears to be amply supported by the evidence.

There were also questions raised as to the financial resources of Gillilan and the heavy mortgages on the property and some arrearage in current bills. In view of the financial troubles of the track while it operated under the name of Aurora Downs, the misgivings of the board as to the financial stability of the enterprise and its prospects for the future appear to have had reasonable justification, and we do not think the discretion of the board was abused in finding Gillilan's financial condition to be a factor supporting a decision against his application. The board also found that the revenue to the State from the proposed Sunday racing at Gillilan's track would probably be less than would be lost to the State at other tracks, based on the State's graduated scale of participation in the proceeds. While this was obviously not based on actual evidence, it was a possibility the board could reasonably consider in weighing the application, since prospective revenue to the State is a consideration mandated by statute.

So far as the original application is concerned, therefore, we think the circuit court's decision affirming the board's rejection of that application was in accord with the evidence adduced at the hearing before the board. We disregard the statement in the appellant's brief that the board was influenced by evidence obtained outside the record, since we find the

evidence of record sustains the decision of the board as to the original application. We are not required to speculate as to whether any other evidence than that of record may have contributed to the board's decision. Like the circuit court, we are confined, in reviewing an administrative decision, to determining whether or not that decision is against the manifest weight of the evidence presented to the board on the question before it. We find that as to the original application, the board's decision was not against the manifest weight of the evidence. See *Alexander v. Civil Service Com.* (1979), 75 Ill. App. 3d 507, and cases cited therein.

▬▌ As to the second and third applications, there was no evidence presented as no hearing was allowed. Gillilan contends that this was a violation of the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1979, ch. 127, par. 1010) as well as the Illinois Horse Racing Act itself (Ill. Rev. Stat. 1979, ch. 8, par. 37—3.14). It is true that the general provisions of section 10 of the Illinois Administrative Procedure Act provide for a hearing "in a contested case" in which (subsection (b)) "[o]pportunity shall be afforded to all parties to be represented by legal counsel, and to respond and present evidence and argument." The second application was not heard on its merits and no opportunity was afforded to Gillilan to respond and to present evidence. Counsel for the State, representing the Racing Board, referred to the doctrine of *"administrative res judicata"* in refusing to consider the second application. However, the doctrine of *administrative res judicata* is not favored in Illinois, and we do not think it is applicable to the case before us. (*Mississippi River Fuel Corp. v. Illinois Commerce Com.* (1953), 1 Ill. 2d 509; *Illinois Power and Light Corp. v. Commerce Com.* (1926), 320 Ill. 427; *Hazelton v. Zoning Board of Appeals* (1977), 48 Ill. App. 3d 348; *Citizens Savings & Loan Association v. Knight* (1966), 74 Ill. App. 2d 234.) On the other hand, however, the situation in this particular case gives some warrant for refusing to consider the second application as being repetitive of the original. The hearing on the original application was on September 24 and 25, and no findings had been made nor any decision announced as to that application on October 29, 1979, when Gillilan presented his second application. The board met in emergency session on November 10, 1979, before its general order of November 15, applying to all race tracks, including Gillilan, had been issued. So far as the record went, the original application was still under consideration at that time. The second application differed from the first in that it showed some improvements had been made to the physical plant and other repairs proposed or bid on. Evidently, however, it was the same application by the same person, submitted within five weeks of the hearing on the first application and before that application had been formally acted upon. Under these circumstances, we cannot say

the board was in violation of the Illinois Administrative Procedure Act in refusing a new hearing on the second application. There was a contention made by counsel who presented the application of October 29 that it was, in fact, a new and only application, since the track had not actually been ready for racing at the time of submission of the original application. But, we think the board was within its discretion in refusing to treat this as a brand new application, never heard or considered before. Moreover, even though improvements had been made between the time of the original application in August and the second application on October 29, other considerations entering into the board's denial of an application for racing were not shown to have been changed in any way, and it was within the board's judgment whether the unchanged factors still mitigated against allowing the application.

A third application, this time for only 44 Sundays remaining in 1980, was filed by Gillilan on January 30, 1980. This also was dismissed without a hearing, both on the ground that it was the same application as had been denied previously and also on the ground that the Sunday dates applied for were already allotted in that they were included in the period of previous allotted racing dates, even though such racing organizations did not race on Sundays. Gillilan complains that the board was in error under section 3.14 of the Horse Racing Act of 1975 in holding that the application of January 30, 1980, was made by the same person as previously applied and therefore was the same application that had already been rejected. Section 3.14 reads as follows:

> "'Person' means any individual, partnership, corporation, or other association or entity, trustee or legal representative." Ill. Rev. Stat. 1979, ch. 8, par. 37—3.14.

■■ Gillilan contends that since a subsidiary corporation is deemed to be a separate "person" from the parent corporation for purposes of applying for racing dates, a corporation wholly owned by an individual must be considered a separate person from the owner. We do not agree. In the one case, the interests are identical, in the other case, they may not be. We agree with the reasoning of the board and the circuit court that a family corporation owned wholly by one person whose officers are his wife and son is not to be deemed a separate "person" from the owner who made the previous application as an individual, for purposes of licensing a racing meeting. For all intents and purposes this was the same application as had been previously rejected.

Finally, it is contended that due process was denied Gillilan because the board acted, not as a deliberative administrative body in its consideration of the application, but as both advocate and judge, contrary to the principles of due process. The board heard evidence on the basis of questions it directed to Gillilan or his attorney, thus putting him in a

defensive position. In effect, Gillilan says, the board thereby acted in an adversary role rather than judicial. We are not persuaded by this argument, however, that due process as generally practiced before administrative bodies was thereby denied the applicant. The nature of administrative agencies requires to some extent the combining of investigative fact-finding functions with the judicial act of making a decision on the case before the agency. Due to the complications of modern society administrative agencies are necessary, and it would destroy their purpose if they were required to act and function exactly as do courts. In *Department of Finance v. Gandolfi* (1940), 375 Ill. 237, 240, the supreme court said:

> "An administrative officer empowered to issue and revoke licenses to engage in a business or profession necessarily exercises quasi-judicial powers in determining whether a license should be issued or revoked, but such exercise of power is incidental to the duty of administering the law and does not constitute the exercise of judicial power within the prohibition of the constitution."

See also *Department of Finance v. Cohen* (1938), 369 Ill. 510, 514, where the court said:

> "'In enacting laws the legislature cannot deal with the details of every particular case, and reasonable discretion as to the manner of executing a law must necessarily be given to administrative officers. Such officers, in the performance of their duties, are frequently called upon to exercise judgment and discretion, to investigate and decide, and yet in doing so they do not exercise judicial power within the meaning of the constitution * * *.'"

■■ It is true, of course, that administrative bodies occasionally overstep the bounds of discretion as to their powers or duties and this is recognized in the provisions for administrative review of such decisions when they do so. However, since they are expected to both investigate and decide, it is recognized that such bodies cannot be held to the objectivity of a judicial trial. As is said in 1 Am. Jur. 2d *Administrative Laws* §§77-78 (1962):

> "§77. An administrative agency may have administrative or executive, investigatory, legislative, or judicial powers or all or a combination of these. It is this combination, in fact, which principally gave rise to the need for 'administrative law' as a separate category of law.
>
> It is well recognized that the doctrine of separation of powers does not preclude a certain degree of admixture of the three powers of government in administrative agencies. * * *."

> "§78. * * * The courts have pointed out that in such situations the agency members must be zealous in the recognition and

preservation of the right to a hearing by impartial triers of the facts, and such fusion of functions has been subjected to considerable criticism. *However, the combination of functions has never been held to violate constitutional right or deny due process of law.*" (Emphasis added.)

On general principles of administrative law, we must reject the plaintiff's argument on this point.

The judgment of the circuit court of Kane County is affirmed.

Judgment affirmed.

VAN DEUSEN and WOODWARD, JJ., concur.